UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

JASON HOWARD,                          )
                                       )
        Plaintiff,                     )
                                       )        No. 5:16-CV-362-REW
v.                                     )
                                       )
PEARL INTERACTIVE NETWORK              )        OPINION AND ORDER
INC., et al.,                          )
                                       )
        Defendants.                    )

*** *** *** ***

With jurisdictional and service-based worries resolved, *see* DE #38 (Opinion), the

Court turns, at last, to the case merits. Specifically, Defendants Pearl Interactive

Network, Inc. (Pearl), Merry Korn,[1] and Diane Schrimpf[2] (collectively, Defendants)

moved for summary judgment on all claims. DE #25 (Motion). Plaintiff Jason Howard

opposed on Count 3. DE #26 (Response). Defendants replied. DE #28 (Reply). For the

following reasons, the Court **GRANTS** summary judgment on Counts 1, 2, 4, and 5,[3] and

**DENIES** summary judgment on Count 3. A jury must resolve Howard's retaliation

claim.

---

[1] Korn is Pearl's CEO. DE #25-3 (Korn Depo.), at 3 (Depo. p. 6).
[2] Schrimpf was, during the relevant period, Pearl's Vice President of Operations. DE #25-7 (Schrimpf Depo.), at 3 (Depo. p. 6).
[3] Howard conceded on all claims other than Count 3, labeled "Retaliation." *See* DE ##1-1 (Complaint), at 8; 26, at 5 (Plaintiff so abandoning). The Court, accordingly, undertakes a merits evaluation only of Count 3 and dismisses all other Counts as voluntarily abandoned. *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006).

1

## I. BACKGROUND

Pearl, an Ohio company that operated a call center in Winchester, hired Howard "for the Contract Center Manger (CCM) position" in July 2013. *See* DE ##25-4 (Howard Depo.), at 3 (Depo. p. 40); 25-5 (Offer Letter); 25-28 (Employee Handbook), at 5. Over a year later, in September 2014, Pearl hired Todd Scully to be manager of the Winchester facility, *i.e.*, Howard's supervisor. DE #25-4, at 14 (Depo. p. 58). Instances of Scully's behavior, the case papers indicate, created concerns in Pearl's Winchester facility. *See, e.g.*, DE #25-29 (10/8/14 email). Howard, at certain points between October 2014 and May 2015, communicated particular perceived problems with Scully to Pearl. *See* DE ##25-29; 25-11; 25-12; 25-18. Ultimately, a June 2015 company reorganization and Howard's December 2015 termination—both of which Plaintiff decries as illegal retaliatory acts—catalyzed this suit, which requires examination of Howard's relationship with Pearl between September 2014 and December 2015.

## II. STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## III. ANALYSIS

As stated, Howard voluntarily narrowed this case to the retaliation claim alone. DE #26, at 5. The parties have briefed the issues, DE ##25-1, at 22-32; 26; 28, and the matter is ripe for consideration. For the following reasons, the Court concludes that a jury must decide Howard's retaliation claim.

### A. Howard established a prima facie *retaliation case.*

The Kentucky Civil Rights Act (KCRA) makes it "unlawful" for "a person, or for two (2) or more persons to conspire" to "retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter[.]" KRS 344.280(1). Howard bases the retaliation claim on this statute. DE #26, at 7-8. "A claim for unlawful retaliation requires the plaintiff to first establish a *prima facie* case of retaliation[.]" *Ky. Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 133-34 (Ky. 2003).[4] "A *prima facie* case

---

[4] The parties agree that substantive Kentucky law applies in this diversity case; the Court, accordingly, undertakes no independent choice-of-law analysis. *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003). Courts generally interpret the KCRA

of retaliation," in turn, "requires a plaintiff to demonstrate (1) that plaintiff engaged in an activity protected by [the KCRA];[5] (2) that the exercise of his civil rights was known by the defendant;[6] (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004). "[T]he appropriate standard to determine whether retaliation has occurred because a discrimination claim was made is whether the retaliatory conduct would have occurred 'but for' the employee engaging in protected complaints of discrimination[.]" *Asbury Univ. v. Powell*, 486 S.W.3d 246, 254 (Ky. 2016).

*First*—Did Howard engage in protected activity? The Court answers affirmatively.

---

"consonant[ly]" with Title VII. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 434 (6th Cir. 2009); *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 821 (Ky. 1992). Howard agrees. DE #26, at 8.

[5] *Brooks* (a Kentucky case) refers to Title VII here; again, Kentucky "interpret[s] unlawful retaliation under the KCRA consistent with the interpretation of unlawful retaliation under federal law." *Brooks*, 132 S.W.3d at 802; *see also Walter v. Guitar Ctr. Stores, Inc.*, No. 5:16-cv-459-JMH, 2017 WL 3260521, at *6 n.3 (E.D. Ky. July 31, 2017) (making the same alteration in the *Brooks* quote).

[6] Not every formulation includes the second element. *See, e.g.*, *McCullough*, 123 S.W.3d at 133-34 ("A claim for unlawful retaliation requires the plaintiff to first establish a *prima facie* case of retaliation, which consists of showing that (1) she engaged in a protected activity, (2) she was disadvantaged by an act of her employer, and (3) there was a causal connection between the activity engaged in and the defendant employer's act." (internal quotation marks and alteration removed)). "Regardless of whether employer knowledge is a stand-alone element of a prima facie case of retaliation, . . . employer knowledge of a plaintiff's protected activity is required. . . . [O]ne cannot retaliate against an employee for engaging in protected activity unless [one] knew the employee had done so." *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008). Howard agrees that the second element properly exists and applies. DE #26, at 8-9.

Activity protected by the KCRA includes "complaining about allegedly unlawful practices[.]" *Roof v. Bel Brands USA, Inc.*, 641 F. App'x 492, 496 (6th Cir. 2016); *see also EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) ("[A] demand that a supervisor cease his / her harassing conduct constitutes protected activity covered by Title VII."). Specifically, as relevant here, the KCRA makes "it unlawful for an employer to discriminate against an employee on the basis of sex," *Roof*, 641 F. App'x at 498, and, accordingly, contemplates sexual harassment / hostile work environment claims. *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) ("A sexual harassment claim brought under the [KCRA] is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart. A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment." (internal citation and quotation marks omitted)). A hostile work environment claim requires, *inter alia*, that the workplace be so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016).

A complaint may be "about alleged discrimination against oneself or others[.]" *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000). Importantly, "all that is required to obtain retaliation protection under KRS 344.280(1) is that the employee have 'a reasonable and good faith belief' that the adverse employment practice[] []he opposed w[as a] KCRA violation[]." *Powell*, 486 S.W.3d at 252. "Thus, an underlying violation of the KCRA need not necessarily be proved to sustain a retaliation claim under KRS 344.280(1)." *Id.* The "reasonable, good faith belief" standard "includes objective

and subjective components: the employee complaining of a hostile work environment must actually believe that the conduct complained of constituted a violation of relevant law, and a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee would believe that the conduct complained of was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) (internal quotation marks and alteration removed). "When plaintiffs cannot satisfy the reasonable, good faith belief standard, an unreasonable mistake of law is generally the problem. . . . In other cases, there are not facts from which a plaintiff could have reasonably believed that a violation occurred." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012). "Title VII does not protect an employee . . . if his opposition is merely a 'vague charge of discrimination.' *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir. 1989); *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007). Although vague complaints do not constitute opposition, '*Booker* does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision.' *Stevens v. Saint Elizabeth Med. Ctr., Inc.,* 533 F. App'x 624, 631 (6th Cir. 2013)." *Yazdian*, 793 F.3d at 645.

Howard meets the standard for protection. He reported, based on the Court's record assessment, facts indicating that he had "a reasonable and good faith belief" that a hostile or abusive work environment existed, in violation of the KCRA. *See Powell*, 486 S.W.3d at 252. Namely, in October 2014, Howard emailed Sonya Smith, Pearl's "HR Manager," DE #26-8, at 2; *see also* DE #26-11, at 20 (Depo. p. 19) ("head of HR"), specifically complaining about an "inappropriate" email he received from Scully. DE #26-7, at 2. Plaintiff further wrote: "It is a concern to me how he [Scully] speaks about

women and I have a concern it will lead to issues down the line." *Id.*; *see also* DE ##25-11, at 2 (Schrimpf emailing Howard in response: "You identified certain comments which you perceived to be inappropriately sexual in nature."); 26-4, at 13 (Depo. p. 12) (Korn agreeing that this email "reflect[ed] the concerns that Jason [Howard] had about Todd [Scully] around that time"). Smith called Howard's report the "first notification of the situation in KY except for some of Kellie's comments." DE #26-8, at 2.[7] The communications (to include related verbal discussions with HR prior to the email) are Howard's principal basis to allege retaliation. DE #26, at 10-11.[8]

---

[7] Kellie Hale, the record indicates, had "several conversations" with Smith "about Todd's behavior." DE #26-8, at 2. Documents reveal that Hale told Smith that Scully said that "they have a boys club" at Pearl's Winchester facility and that "you can't tell a male from a female" in Thailand. *Id.* Hale also reported that Scully "grabb[ed] himself and readjust[ed] the entire time right in front of" two women. *Id.*

[8] Howard vaguely asserts, in a single paragraph, that his "previous[] support[]" for April Shaw, a former Pearl employee, "in her complaints filed against Todd Scully . . . would constitute protected activity under the Kentucky Civil Rights Act." DE #26, at 11. This is not a theory the Complaint contemplates. *See* DE #1-1, at ¶ 30 (basing the retaliation charge on the acts of "filing a complaint with Defendant regarding Mr. Scully's inappropriate behaviors" and "filing a complaint with Defendant"); *see also* DE #26-2, at 66 (Depo. p. 183) (Howard: "[T]hat's the **only reason** why I was moved to that position: because of complaints that I had made." (emphasis added)). Paragraphs 1-22, which ¶ 29 "incorporates by reference," also do not mention this separate theory of liability.

Accordingly, the Court rejects the Shaw-based argument. *See Desparois v. Perrysburg Exempted Village Sch. Dist.*, 455 F. App'x 659, 665-66 (6th Cir. 2012) (rejecting the notion that a plaintiff is "entitled to liberal construction of her complaint to include new theory raised for first time at summary judgment stage"); *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion." (citing many cases for this proposition)); *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989) ("A party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories[.]"). A complaint, simply put, must "give the defendant[s] fair notice of the claim and its supporting facts," *Tucker*, 407 F.3d at 788, and Howard's Complaint did not do so, as to this new, distinct theory. Plaintiff, notably, does not argue to the contrary.

The incendiary content is not, itself, in the record. Per the HR investigation, Scully had likened the voice of a bilingual female call-center employee to that of a porn star on a graphic prank phone call played on the Howard Stern radio show. Scully discussed this untoward observation at work, attempting to involve Howard and another manager by sharing the explicit material—Howard got the link by an unsolicited personal email from Scully (sent to him with the direction to distribute to the other manager) and promptly involved HR.

Howard thus, to Pearl management, described Scully, the highest-level employee at the Winchester site, sexualizing one of the bilingual CSRs, *see, e.g.*, DE #26-11, at 41-42 (Depo. pp. 40-41) (defining CSR), likening a low-level employee to a porn star. Further, Howard reported Scully discussing a video or audio clip involving a prank call

---

Alternatively, even if the Court glanced at the merits, Plaintiff cites no law and includes no distinct proof on this argumentative point. His only evidentiary reference is to deposition pages 184-87, in which he "guess[ed]" that "one could assume" that his being involved "in an active case with April" may have undergirded the alleged retaliation. *See* DE #26-2, at 67-70 (Depo. pp. 184-87). The deposition testimony is, thus, distinctly qualified and largely indeterminate. Further, there is no record proof of an EEOC filing by Shaw, and Title VII "protects an employee's activities that occur in conjunction with or after the filing of a formal charge with the EEOC, not an employee's participation in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC; at a minimum, an employee must have filed a charge with the EEOC or otherwise instigated proceedings under Title VII." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) (internal quotation marks removed); *see also Harrison v. Oakland Cnty.*, 612 F. Supp. 2d 848, 860 n.19 (E.D. Mich. 2009). Thus, asserting generalized "support" for a co-worker, divorced from formal Title VII-related proceedings, does not suffice. *See, e.g.*, *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 906-07 (W.D. Ky. 2015). The text of KRS 344.280(1) specifically confirms this: it prohibits retaliation because a person "testified, assisted, or participated in any manner **in any investigation, proceeding, or hearing under this chapter**," not because he assisted, participated in evaluating, or supported an *informal* claim of discrimination. Plaintiff admits that he "was not formally identified as a witness for Ms. Shaw until January 2016," after his employment ended. DE #26, at 11. Remember, in deposition, Howard tied the alleged retaliation to his involvement in "an active case with April."

by the star. Smith reviewed the call, which she characterized as "someone on the phone talking about sexual content and it is very descriptive." DE #26-8, at 2.

Without question, Pearl's investigation revealed a host of inappropriate sexual remarks and sexual / discriminatory conduct by Scully pertaining to the workplace. *See* DE #26-8. Korn seemed to acknowledge this in deposition. *See* DE #26-4, at 14-15 (Depo. pp. 13-14). Indeed, as to Plaintiff, Scully had asked Howard, a subordinate, to send the Stern link to Tony Listermann, another Scully subordinate. Howard refused (directly opposing to his boss) and instead reported to HR (directly opposing to Pearl). Plaintiff's October 2014 report obviously opposed the conduct, specifically referenced gender, and cited his concerns regarding the problems Scully's behavior could cause the company.

To be sure, Howard's February 2015 and May 2015 written complaints are not explicitly about discrimination. Howard clearly paints Scully as a jerk, but Plaintiff also does harken back to the beginning. The baseline conduct involved alleged sexual impropriety and sex discrimination, and Howard's later complaints arguably refer back to that baseline. *See* DE ##26-9 (Feb.) & 26-10 (May). In February, Howard specifically sought the contact info for Scully's original HR coach ("Don," the coach brought in after the 10/14 investigation). *See also* DE #26-11, at 24 (Depo. p. 23). This suggests an inferential link to the original conduct. Plaintiff then described the environment as "ugly" and said, using a comparative, it was "worse than ever." This included reference to at least one female and also cited to Scully's body-shaming of employees. Later, in May, Howard said things were "no better than" in the past, that Scully was unfairly targeting employees, and that morale was at its lowest possible point. Further, Pearl brass seemed

to view Scully as simply unable to meet the culture expectations—as horrifying, even unchangeable. *See* DE ##26-4, at 17 (Depo. p. 16) ("[W]hat was your reaction to the way Todd Scully was behaving? Horrified."); *id.* at 23 (Depo. p. 22) ("And I think at some point we realized this is a man that's not changeable."); 26-11, at 11-12 (Depo. pp. 10-11) ("And it appeared that Mr. Scully was going to continue to not embrace our culture."). A jury might view the 2015 complaints as unrelated and having utterly no discrimination content, but a jury also might rationally treat them all as of a piece related to the improper and unprofessional behavior of a high-level Pearl manager. That call is for the jury.

Indeed, in the report back to Howard from 2014, Pearl expressly acknowledged the sexual impropriety alleged. Howard had not only flagged the specific conduct, but he had remarked explicitly about concerns over how Scully "speaks about women." In the context of the prank phone call, and given that Howard lit the fuse on an investigation that, in fact, revealed sexual and belittling remarks and conduct by Scully involving women and sex, there is, at least, a jury question on the protected nature of the conduct. [Listermann also indicated that Howard had referenced the job placement of bilingual employees and had linked one of the employees and the porn-star reference. Undoubtedly, there is enough in this description to raise the specter of unlawful sex discrimination / sexual harassment. *See* DE #26-8, at 5-6.] Further, and critically, in the responsive report, Pearl assured Howard that company policy protected him from retaliation. *See* DE #25-11, at 2. The Pearl HR policy has a sexual harassment reporting mechanism that expressly provides non-retaliation protection. *See* DE #25-28 (Handbook

containing multiple anti-retaliation provisions). Pearl surely would not tell Howard he was protected if he had not lodged a protectible report.[9]

Given the graphic nature of the conduct, the sexual objectification of a subordinate, the attempt to compel dissemination of sexually explicit material via a different subordinate, and Plaintiff's express reference to Scully's vocalization about women, the Court concludes that Howard's complaints, under the applicable standard, qualify as good faith opposition. *See* EEOC Guidance on Retaliation (EEOC Manual Sec. 8), at II.A.2.a & II.A.2.c (Example 2);[10] *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504-05 (6th Cir. 2014) ("Thus, when all facts must be viewed in the light most favorable to [Plaintiff] and all reasonable inferences must be made in h[is] favor, we conclude that [he] could have had a good-faith, reasonable belief that []he was reporting unlawful sexual harassment. Whether []he actually held such a belief, a question of credibility, must be left to a jury."); *Yazdian*, 793 F.3d at 645; *Powell*, 486 S.W.3d at 252. As in *Wasek*, Howard "definitely could have" had "a reasonable, good faith belief" that

---

[9] Interestingly, the company response claims it had taken steps to stop "further" inappropriate conduct. DE #25-11, at 2. Also, Pearl's Fifteenth Affirmative Defense says that "Defendants exercised reasonable care to . . . promptly correct harassing behavior." DE #4, at 9. If Howard catalyzed an investigation leading to proper remedial action in the harassment context, it would be difficult to find that Howard did not oppose discrimination for anti-retaliation purposes.

[10] The Sixth Circuit gives "'great deference'" to the EEOC's interpretation of 'opposing' conduct[.]" *New Breed Logistics*, 783 F.3d at 1067. The Guidance explicitly contemplates protection for resisting conduct that may become, but is not yet, actionable. *See* § II.A.2.a ("The opposition clause applies if an individual explicitly or implicitly communicates his or her belief that the matter complained of is, **or could become**, harassment or other discrimination." (emphasis added)). The breadth of protected opposition is expansive. *See id.* ("The communication itself may be informal and need not include the words 'harassment,' 'discrimination,' or any other legal terminology, as long as circumstances show that the individual is conveying opposition or resistance to a perceived potential EEO violation. Individuals may make broad or ambiguous complaints of unfair treatment, in some instances because they may not know the specific requirements of the anti-discrimination laws." (footnote removed)).

Scully was discriminating on the basis of sex. 682 F.3d at 469-70 (contrasting cases in which there was "'absolutely no evidence from which a reasonable person could conclude that' discrimination occurred," a high standard and ill fit to Howard's facts).

*Second*—Was such engagement known to Pearl? The Court, again, answers affirmatively. On one level, the answer is easy. The record reveals that Defendants obviously knew of Howard's various complaining communications—*i.e.*, his (arguable) engagement in protected activity. *See, e.g.*, DE #25-11 (Schrimpf Email, cc'ing Korn). There is no question of actual knowledge of Howard's complaints.

As to other defensive suggestions on this front, however, the Court also asks whether Howard's complaints "convey[ed] opposition to the" alleged discriminatory conduct at issue "in a way that [Defendants] should have recognized" or whether Defendants would have "underst[ood] plaintiff to be complaining about" alleged discrimination. *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 560 F. App'x 460, 467-68 (6th Cir. 2014). The central issue, thus, is whether "a reasonable juror" could "conclude that" Defendants "knew" Howard "had engaged in protected . . . activity." *Id.* at 469.

Again, the answer, on the full record, is yes—a reasonable juror could conclude that Defendants understood Howard to be complaining about discrimination and knew him to be engaging in protected conduct. *See* DE #25-11, at 2 (Pearl, through Schrimpf, recognizing the comments that Howard "perceived to be inappropriately sexual in nature," describing the intensive company response, ensuring that the company is "taking reasonable measures designed to address the concerns and prevent any further inappropriate or unprofessional communication," and reminding Howard of Pearl's

"policy against retaliation"). Considering what Defendants knew of Scully's behavior (described in more detail above), a reasonable juror certainly could conclude that they should have recognized and understood Howard to be complaining about sex discrimination. This surely is not the *only* conclusion a reasonable juror could reach, but it is definitely a *possible* one. Howard thus satisfies *prima facie* case element two.

*Third*—Did Pearl thereafter take an employment action adverse to Howard? Again, one rational answer is yes.

According to the Sixth Circuit, the KCRA "prohibit[s] only 'materially adverse' employment actions, *i.e.*, actions that are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting' a complaint." *White v. Coventry Health & Life Ins. Co.*, 680 F. App'x 410, 414 (6th Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2409 (2006)).[11] "A material modification in duties and loss of prestige may rise to the level of adverse action." *Brooks*, 132 S.W.3d at 803. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 802.

---

[11] *See also White*, 680 F. App'x at 414 n.1 (noting potential conflict between *Brooks*'s and *Burlington v. White*'s treatment and ultimately "not determin[ing] whether Kentucky continues to ascribe to the pre-*White* definition"). The Kentucky Supreme Court, the ultimate voice on the Commonwealth's law, has cited the *Burlington v. White* standard as authoritative in the "adverse employment action" context. *See Norton Healthcare, Inc. v. Deng*, 487 S.W.3d 846, 855-56 (Ky. 2016). Remember that the "KCRA tracks federal case law for guidance on claims based on gender discrimination." *Bd. of Regents of N. Ky. Univ. v. Weickgenannt*, 485 S.W.3d 299, 306 (Ky. 2016). Howard's claim would survive summary judgment even applying *Brooks*'s aged standard—that is, for all the reasons discussed, Plaintiff has validly "identif[ied] a materially adverse change in the terms and conditions of his employment[.]" 132 S.W.3d at 802.

As to Howard, there are two actions at issue: the June 2015 reorganization and the December 2015 termination. The Court considers this a close call, as to the reorganization.

On this record, two conclusions are reasonably possible. Pearl's factual version is that Schrimpf was contemplating reorganization from January 2015, based on business reasons. She and Pearl, in this narrative, took action prompted by May 2015 issues with Scully, formulating a plan to separate Scully from day-to-day operations of the company. This reorganization, for financial and planning reasons, put Brenda Wingert in charge, inserted her between Scully and others, and led to reconstitution of Howard's duties. Defendants thus describe a benign process designed to give Howard a new job, separated from Scully, with new opportunities tailored to his particular skills.

Maybe a jury will buy that narrative. But, Howard's darker depiction has its merits and supporting proof:

1) Pearl did change (arguably reduce) Howard's title from Operations Manager to Project Manager. *See* DE #26-2, at 9 (Depo. p. 126). At termination, Pearl explicitly called him "Project Administrator," *see id.*, which might have even lower-level titular implications. *See also id.* at 21 (Depo. p. 138) ("I got moved down.").

2) Pearl stripped Howard's supervisory role. He went from overseeing twelve supervisors to having zero direct reports. *See* DE #26-2, at 17 (Depo. p. 134) (Howard stating that having "no direct reports" and "no title[] scared the bejesus out of [him]"). This objectively changed the job in a way that is material.

3) Pearl put Howard into a newly created job. At the time, the job had no defined duties, and Howard and his supervisor had to try to formulate responsibilities.

*See* DE ##26-2, at 9 (Depo. p. 126); 26-4, at 28 (Depo. p. 27); 26-6, at 19 (Depo. p. 18); 26-11, at 37 (Depo. p. 36). Those duties became focused on employee morale / retention, making Howard largely a cheerleader. *See* DE #26-2, at 10-11 (Depo. p. 127-28) ("lowering attrition and promoting a positive work environment"; "employee engagement specialist"; "help with our employee retention and morale"; "I'd be like the Pearl communicator[.]"; "I'd hand out candy."); *id.* at 27 (Depo. p. 144) ("Pearl's superhero").

4)      Howard reports that the change reduced his role and access to senior management meetings. Ultimately, he attended these meetings only as needed. *See* DE #26-2, at 22 (Depo. p. 139).

5)      Howard felt demoted. Pearl put him under a new supervisor, dropping Howard within the organizational chart. He went from directly under the site supervisor to two levels below the ultimate boss. Howard immediately recognized that the job was undefined and had an unstable foundation, as he expressed in detail at the time of the reorganization. *See* DE #26-2, at 42 (Depo. p. 159) (expressing that he felt "expendable" because he was "not generating any revenue for that call center" and had "nobody reporting to me that produces anything"). Korn recognized this. DE #26-4, at 26-27 (Depo. pp. 25-26) ("So he was disappointed, he was sad about it, and he said so[.] . . . [H]e felt that it was a demotion[.] . . . I think he was sad that his team of 12 supervisors was taken from under him.").

6)      Howard felt a loss of prestige in interacting with prior subordinates. They would see him working on his morale function and treat him as the object of pity or concern. This embarrassed Howard, an objectively reasonable reaction to being seen as "put out front." *See* DE #26-2, at 28 (Depo. p. 145) ("It was embarrassing[.]"); *id.* at 32

(Depo. p. 149) ("And this position, again, there's so many parts of it that embarrassed the heck out of me on a daily basis[.]"); *id.* at 34 (Depo. p. 151).

Howard did view the job as actually important, *see id.* at 43 (Depo. p. 160), which cuts against the material adversity finding, as do his compliments for the CEO. Nevertheless, the overall context could reasonably support a finding that Howard's new position was materially lower relative to his prior slot. Howard reported that the reorganization influenced him against later complaining; he deemed the reaction to his complaints as leading to demotion, and he testified that he thereafter planned to keep quiet and not "stir any more of that pot." DE #26-2, at 36 (Depo. p. 153). That he did not complain again is corroborative. Further, the rational perception that raising a complaint led to reorganization of the type that occurred could reasonably discourage a further complaint, in the Court's view.

This analysis goes only to the reorganization. Obviously, Pearl terminated Howard in December 2015. Termination, without question, qualifies as a materially adverse action. *Wasek*, 682 F.3d at 470. Howard thus, for these cascading reasons, satisfies element three.

*Fourth*—Was there a causal connection between the protected activity and the adverse employment action? The Court again finds a positive answer plausible.

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. [A]ll the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (internal quotation marks

and citations removed). "[T]he appropriate standard to determine whether retaliation has occurred because a discrimination claim was made is whether the retaliatory conduct would have occurred 'but for' the employee engaging in protected complaints of discrimination[.]" *Powell*, 486 S.W.3d at 254.

Again, this is a close call, in some respects, between clashing inferences. The Court ultimately concludes that there are valid jury questions on the causal connection between Howard's complaints and a) the reorganization and b) the termination.

The parties broadly focus on burden shifting, but this is a *direct evidence* case, at least as to the reorganization. *See, e.g.*, *Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir. 2000) ("The direct evidence and circumstantial evidence paths are mutually exclusive; the plaintiff can meet h[is] burden with either method of proof." (extensively describing the different standards)). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 522 (internal quotation marks removed).

Here, Howard repeatedly testified that Korn and Schrimpf directly told him his job reorganization resulted from his complaints to Pearl. *See, e.g.*, DE #26-2, at 52, 53, 56 (Depo. pp. 169, 170, 173) (*e.g.*, "It was given to me because they were trying to help me because of the feedback that I had given and problems that were going on with Todd."; "I was told that I was moved because I had made complaints to HR about specific things and there were taking care of me."; "Merry and Diane said that, 'We are moving you because you have made these complaints.'"). While the timing itself is also persuasive, Korn and Schrimpf stated in depositions that the complaints were the final straw leading to the reorganization. DE ##26-11, at 12-13 (Depo. pp. 11-12); 26-4, at 14

(Depo. p. 23). This is direct evidence, under the standard, of a causal connection on the reorganization.

Next, a jury could reasonably conclude that the 2015 reorganization involved a planned and coordinated effort to remove both Scully and Howard from the company—in other words, to ultimately terminate them. This is, in contrast to the reorganization decision itself, a circumstantial evidence question. "[C]ircumstantial evidence of causation is evidence sufficient to raise the inference that the protected activity was the likely reason for the adverse action. In most cases, this requires proof that (1) the decision-maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action. In addition, proof that the plaintiff was treated differently than other employees after engaging in protected activity may further support an inference of causation." *Powell*, 486 S.W.3d at 258 (internal quotation marks, alteration, and citations removed). Finding a causal connection on Howard's termination surely is not the *only* reasonable conclusion on this record, but it is *a* conclusion a reasonable jury could reach. This results from the following:

1)      Korn and the company undoubtedly intended to get rid of Scully. Despite that direct intent, Pearl intentionally created a phased plan that placed Scully into an off-site position (though still in charge). The plan was to develop Brenda Wingert and then terminate Scully. *See* DE ##26-11, at 28-30 (Depo. pp. 27-29); 26-4, at 18-20 (Depo. pp. 17-19); *see also id.* at 22 (Depo. p. 21) ("All I cared about was is [sic] the plan to oust Todd.").

2)     Howard arguably suffered a parallel fate. Korn and Schrimpf (telling Howard his complaints had led to the reorganization) put Howard into a new position, awkwardly jutting out and stranded on the company organizational chart, with no defined duties and no one reporting to him. Then, within mere months, Pearl determined to terminate that position. Importantly, it concluded and communicated that the new position was "no longer required." *See* DE #26-12, at 2; *see also* DE #26-2, at 50 (Depo. p. 167) ("no longer needed").

3)     Pearl's financial justifications could reasonably warrant an inference that Pearl planned to rid itself of Howard. Thus, Wingert testified that the company was already losing money under the 2014-15 contract and would face an even more exacting client under the next year's cost-plus contract model. DE #26-6, at 26-28 (Depo. p.. 25-27); *see also* DE #25-27, at ¶ 4. In June 2015, Pearl's Phase I likely increased employee cost by adding two junior managers into the mix. Thus, Howard found himself in a position with no direct reports, no pre-defined duties, and at a company (facing financial scrutiny) that would be searching for places to cut. It would be rational for a fact-finder to view the position as doomed to fail—and *designed to be* so fated. Notably, Howard hit his performance metrics for the new job, satisfying all duties. DE #26-2, at 72 (Depo. p. 189). Wingert (and derivatively Schrimpf) mildly criticized him for not having enough "initiative," not "stepping up," and not "evolving" in the slot. *See* DE ##26-4, at 32 (Depo. p. 31); 26-6, at 21 (Depo. p. 20); 26-11, at 13 (Depo. p. 12) (noting "a final change" the company wanted to make—terminating Howard: "Howard's role had not evolved into anything that we could move forward with, and so we eliminated that position as well"). He only had seven months to prove the worth of a new position. Some

of Schrimpf's language (using "Phase I," for example, plausibly begets there being a "Phase II," and the term "final" reorganization) indicates a long-term plan with respect to Scully and Howard. *See* DE ##25-7, at 20-23 (Depo. pp. 56-57, 60, 62) (discussing that in the final piece of reorganization, Howard's duties could be done by low-level administrative assistant); 26-11, at 13 (Depo. p. 12); *id.* at 58 (Depo. p. 57); 26-2, at 57 (Depo. p. 174) ("But did I have an inkling in my mind that this move was happening and it wasn't going to be a positive ending? Absolutely."); *id.* at 61 (Depo. p. 178) ("[W]e're going to move Jason into this job here, whether to protect me or whether to move me to a position to terminate me, either way, eventually that move is what cost me my job. Period. . . . And then because I was moved, I eventually lost my job because I moved into a position that was no longer needed. . . . So, yes, I'm correlating the two and attributing them both.").

4)     Wingert was aware of the reorganization and got the new site manager post. Critically, she immediately perceived that Howard would be on thin ice in terms of job duration. She testified that she expressed skepticism that, under the new contract negotiations, Howard's position would get approval. *See* DE #26-6, at 24 (Depo. p. 23). Surely, Schrimpf and Korn, who created the structure, knew better than anyone that Howard's spot was very tenuous.

To be sure, there is a benign way to assess the series of occurrences (a view Defendants urge), and there is undoubtedly evidence to support a legitimate business decision alone. Part of the problem, though, is that Pearl clearly orchestrated Phase I with a hidden intent to have a Phase II. This was, no doubt, true for Scully, and it ended up (arguably) appearing to be true for Howard. Plaintiff was a primary complainant and seen

as one of the major problems vis-à-vis Scully. *See* DE #26-4 at 24 (Depo. p. 23) (Korn characterizing Howard and Shaw, both fired, as having "suffered the most" under Scully). As relevant in this context, on Rule 56 review, the benign view is not the only reasonable portrayal. Howard saw correlations and attributive aspects between the reorganization and sacking; so could a reasonable jury. Accordingly, the Court finds that Howard satisfied *prima facie* element four as to both the reorganization and the termination. Plaintiff thus, per this sequential analysis, established a *prima facie* retaliation case against Defendants.

> **B.** **Howard demonstrated, under the applicable standard, that Defendants' articulated legitimate, non-discriminatory reasons were mere pretext for an actual improper motive.**[12]

Because Howard "established a prima facie case, the burden shifts to [Defendants] to articulate a legitimate nondiscriminatory reason for the [adverse] decision." *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005). "The burden of providing a legitimate, nondiscriminatory reason is not high." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 694 (E.D. Ky. 2014).

> Once an employer provides a legitimate, nondiscriminatory reason for its actions, the employee must show that the stated reason 'is merely a pretext for discrimination.' *Weigel* [*v. Baptist Hosp. of E. Tenn.*], 302 F.3d [367,] 378 [(6th Cir. 2002)]. A plaintiff can show pretext by demonstrating that the proffered reasons: (1) had no basis in fact, (2) 'did not actually

---

[12] The Court includes this analysis for thoroughness, as to the termination theory. A "direct-evidence claim," such as Howard's reorganization theory, on the other hand, "is removed from th[is] burden-shifting framework[.]" *Chattman v. Toho Texas Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012); *see also McCullough*, 123 S.W.3d at 134 (stating this burden shifting framework is applicable only "[i]n a case where there is no direct evidence of retaliation"). As to the reorganization theory, the analysis is considerably more direct: "the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Chattman*, 686 F.3d at 346-47 (internal quotation marks removed). That call, on this record, is for the jury.

motivate the company's decision' or (3) were insufficient to support defendants' actions. *Cline v. BWXT Y–12, LLC*, 521 F.3d 507, 509 (6th Cir. 2008). To show that the proposed reason was merely pretext, the plaintiff must provide more than mere speculation. *Hagan v. Warner/Elektra/Atl. Corp.*, 92 F. App'x 264, 268 (6th Cir. 2004). The Sixth Circuit has indicated that the plaintiff must introduce more than doubt to satisfy this burden:

> The plaintiff has the burden of persuasion on this point. This burden is not satisfied by introducing 'metaphysical doubt' as to the intent of the decision-maker or the adequacy of the process. Plaintiff was required to bring forward evidence tending to show that retaliatory animus was the but-for cause of her termination. Her subjective belief that defendant's proffered reason is false, and that retaliation was the actual motive, is not sufficient to withstand summary judgment.

*Carson v. Ford Motor Co.*, 413 F. App'x 820, 824 (6th Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586, 106 S. Ct. 1348).

*Banks*, 15 F. Supp. 3d at 694-95 (internal alterations removed); *see also Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (describing same burden shifting framework under the KCRA). At bottom, to meet his burden on pretext, Howard "must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007).

Defendants articulate legitimate, non-discriminatory reasons for the termination (and, indeed, the reorganization), as described in more detail above. The Court holds that, in response, Howard identified sufficient evidence to require submitting the question to a jury. A reasonable jury, on these particular facts, could reject Defendants' proffered reasons and find that they were mere pretext for Defendants' actual improper motive. *See, e.g.*, *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) ("An employer's business judgment . . . is not an absolute defense to unlawful discrimination."). Howard has produced, in the Court's assessment, "enough evidence to

rebut" Defendants' "proffered rationale." *Yazdian*, 793 F.3d at 651 (internal alteration removed); *see also* DE #26-2, at 43 (Depo. p. 160) ("I believe that they put me in this position in order to put me in a position that was easily – easily expendable. Absolutely."); *id.* at 44 (Depo. p. 161) ("I expressed it at that time, that they were making a move because they – they were taking me out of the equation . . . and putting me in a situation that I did not – I didn't have any value to the company.").

     This result largely emanates from the facts and particulars discussed above. The case, to a great degree, boils down to the parties presenting two competing narratives, stories, and sets of inferences. Maybe Defendants, as they claim, responsibly managed a difficult boss and made reorganization and termination decisions based only on objective business needs. But, maybe the involved actors, as Howard claims, mishandled shocking misconduct by its lead employee in Kentucky and then implemented a plan to, over time, eliminate both him and the key complainant that lit the fuse on the investigation. If Defendants did actually take adverse employment actions against Howard because he complained about Scully's sexual discrimination, and then attempted to shield the improper motives via an elaborate employee-happiness or business-necessity ruse, a jury could reasonably call that what it is: pretext.

     In the Court's evaluation, a jury could reasonably hear the proof and side with Howard, labeling the defensive business-related justifications mere intricate wile and perceiving actual underlying discriminatory motives as spurring the actions regarding Howard. *See, e.g.*, *Jones v. Potter*, 488 F.3d 397, 408-09 (6th Cir. 2007) (labeling as "the very definition of pretext" a plan by an employer to "wait[] for a legal, legitimate reason to fortuitously materialize, and then use[] it to cover up [the] true, longstanding

motivations for firing the employee"). Neither side's tale is compelling enough, on the record, to be the only reasonable one, and the Court concludes, on review of the full record and applying the Rule 56 rubric, that there is sufficient evidence for a reasonable jury to find liability for retaliation. *See, e.g.*, *Hostettler v. College of Wooster*, ___ F.3d ___, ___, No. 17-3406, 2018 WL 3432244, at *10 (6th Cir. July 17, 2018); *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779-80 (6th Cir. 2016); *Wexler*, 317 F.3d at 578 ("In sum, this is a case that on its facts could go either way. . . . The conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment[.]"); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 666-67 (6th Cir. 2000) ("Factually, this case is a tightly-waged battle. Cline presented a variety of concrete evidence casting into doubt the 'reason' St. Paul proffered[.] . . . No doubt, St. Paul may have sharp retorts to many of Cline's factual claims. Indeed, many of its responses could well convince a trier of fact of its case. But at this stage in the trial, the district court's . . . role is not 'to weigh the evidence and determine the truth of the matter,' but 'to determine whether there is a genuine issue for trial.'" (internal citation removed)).[13]

---

[13] The summary judgment denial on the retaliation claim applies to all defendants. Korn and Schrimpf can face individual liability for KCRA retaliation, *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 794 (6th Cir. 2000), and the Court's analysis in this Opinion applies with equal force to the actions each took as participants in the relevant events. The called the shots. Defendants' focus on the intra-corporate conspiracy doctrine is misplaced; Howard argues each individual directly retaliated against him, a claim the KCRA contemplates. *See* KRS 344.280(1) (making it unlawful for "a person" to "retaliate or discriminate"); DE #26, at 7 ("This matter involves actions taken by Merry Korn . . . and Diane Schrimpf . . . against Jason Howard in June 2015 and December 2015." (seeking to hold them "personally liable . . . for those actions")). The two cases Defendants cite are inapposite; both solely involved KCRA conspiracy claims. *See Cowing v. Commare*, 499 S.W.3d 291, 293-95 (Ky. Ct. App. 2016); *Walter v. Guitar*

## IV.  CONCLUSION

For the reasons, to the extent, and on the terms stated, the Court **GRANTS IN PART** and **DENIES IN PART** DE #25.

This the 6th day of August, 2018.

Signed By:

_**Robert E. Wier**_

**United States District Judge**

---

*Center Stores, Inc.*, No. 5:16-cv-459-JMH, 2017 WL 3260521, at *5 (E.D. Ky. July 31, 2017) (conspiracy to retaliate).